PHILIP SALTMAN *vs.* ALAN SMITH & another.

Suffolk.   October 7, 1942. — January 28, 1943.

Present: FIELD, C.J., QUA, DOLAN, & COX, JJ.

*Contract,* Of employment, Performance and breach, Construction. *Equity Jurisdiction,* Employee's covenant against competition. *Labor and Labor Union. Equity Pleading and Practice,* Injunction, Decree. *Words,* "Radius."

Subsidiary findings by a master as to the circumstances in which an employer accepted the resignation of an employee at the conclusion of unsuccessful negotiations for a new contract of employment, but, upon having his attention directed to the fact that the current contract of employment had not expired, told the employee that he might continue at work until it expired, whereupon the employee took the position that he had been discharged and declined to continue, justified a conclusion by the master, based solely thereon, that the employer had not wrongfully discharged the employee.

A suit in equity against a former employee of the plaintiff to enforce a promise by the defendant not to compete with the plaintiff did not present a "labor dispute" within G. L. (Ter. Ed.) c. 149, § 20C, inserted by St. 1935, c. 407, § 1, and the power of the trial court to enjoin the defendant was not subject to G. L. (Ter. Ed.) c. 214, § 9A, inserted by St. 1935, c. 407, § 4, but might be exercised on the basis of facts found by a master.

In the circumstances, under a provision of a contract of employment between the proprietor of a music school and a teacher therein, that after termination of the contract the employee would not compete with the employer in Boston or "within a five mile radius" of that city or any municipality where the employer had a place of business, it was proper to measure such five miles "in all directions from the boundaries of" Boston and of each of the other municipalities rather than merely to draw a circle with a five mile radius around the employer's place of business in each municipality.

A certain decree enforcing by injunction a promise by a former teacher in the plaintiff's music school not to compete with the plaintiff in certain areas was reasonable as to space, considering the scope of the plaintiff's activities, the location of his places of business, and the areas from which his pupils were drawn.

BILL IN EQUITY, filed in the Superior Court on September 9, 1941.

An interlocutory decree confirming a master's report and a final decree were entered by order of *Morton, J.* The defendants appealed from both decrees.

*E. S. Farmer,* for the defendants.

*M. L. Orlov,* for the plaintiff.

DOLAN, J. This is a bill in equity by which the plaintiff seeks to have the defendants Alan Smith and Helen Koss enjoined from violating restrictive covenants, contained in employment contracts which had been entered into by each of the defendants with the plaintiff, and other relief.

The case was referred to a master whose material findings may be summarized as follows: The plaintiff, a resident of Boston, is now and for a number of years has been engaged in teaching piano and conducting a school for that purpose under the name of "Phil Saltman Studios of Modern Music." He specializes in the "teaching of so called modern music or 'jazz.'" He started teaching in the 1920's at his home in Revere, and in 1930 he opened his first studio in Boston. Since 1938 his main and only studio in Boston has been located in a building at the corner of Commonwealth Avenue and Gloucester Street. He has established branch studios in Worcester, Wellesley, Lynn, Lowell, Haverhill and Springfield, and also in Providence, Rhode Island, and in Hartford, Connecticut. During the past ten years he has offered for sale instruction books bearing his name in the title. For a number of years he has broadcast weekly from a Boston station a program known as the "Piano Club of the Air." His name has been featured in those broadcasts, as well as in others sponsored by business concerns in Boston. He has advertised his school from time to time in the Boston newspapers. From "an average of sixty-five pupils a week in 1934 he now has an average of three hundred fifty to four hundred pupils a week during the more active part of the school season." Most of his pupils attended his studio in Boston. "Approximately fifteen per cent of the pupils studied voice and not piano." In 1934, having determined to enlarge his school and to employ

teachers to assist him, the plaintiff employed the defendants. Both of them had been pupils of the plaintiff. They continued in the plaintiff's employ as employees at will until the fall of 1938, at which time the plaintiff presented to each a written contract of employment which had been prepared by his attorney. The respective contracts, identical in terms, were read by the defendants and executed on October 24, 1938. The contracts provided for compensation to the defendants based on a percentage of fees paid to the plaintiff by the pupils they taught. The contracts were to be in force for two years from October 24, 1938, with the right and option on the part of the "Studios" to continue the agreement for five additional periods of one year each upon the same terms, and the options were to be deemed to have been exercised unless the "'Studios' shall inform the 'Teacher' to the contrary on or before the expiration of this agreement or any of the renewal terms hereof." Under this provision the contracts were extended to October 24, 1941.

"One of the provisions of each contract entered into by each of the defendants with the plaintiff provided that — 'It is expressly agreed that, for a period of three years after the termination of this employment, for any cause whatsoever, the "Teacher" will not directly or indirectly, as employer, employee, or otherwise, engage in the business of the "Studios," nor act in aid of the business of any rival, or competing person, firm, or corporation, in the same or a similar business within the City of Boston or within a five mile radius of said city or any cities where there are now or may be then established a place of business, permanent or temporary, of the "Studios"; and that the "Teacher" will not, at any time, disclose or furnish to any person, firm, or corporation, other than the "Studios," the names or addresses of any of the customers or pupils of the "Studios"; and that the "Teacher" will not, at any time, solicit or canvass the patronage of the customers or pupils of the "Studios".'"

Toward the end of 1940 the defendants became dissatisfied with their earnings, which were falling off. They

discussed the matter frequently with the plaintiff. In December, 1940, at a conference with them and one Rose, the plaintiff said that he would try to arrange for their compensation on a salary basis instead of commissions. On August 13, 1941, the plaintiff offered the defendants a straight salary arrangement for forty forty-eight hour weeks per year. They expressed dissatisfaction and on August 22, 1941, the defendant Koss, as spokesman for herself and the defendant Smith, gave the plaintiff to understand that if he insisted on his proposed new arrangement they would leave his employ. The plaintiff said that he would consider the matter further. On August 26, 1941, the plaintiff told Smith that he was not going to change his mind, and would accept Smith's resignation, and that he (Smith) would be through at the end of the coming week. Smith urged a compromise but the plaintiff refused to compromise. Smith pointed out that it was short notice but made no other protest. On the same day the plaintiff advised the defendant Koss that, in view of her statement that she would quit unless he was prepared to compromise, he would let her go. Koss told the plaintiff that she would like to talk the matter over with her parents and that she would "phone" the plaintiff the next morning and let him know what her decision was. At the time of the conferences between the parties there was no reference to the fact that the defendants' contracts did not expire until October 24, 1941, but it was understood by all that, if the proposal was accepted, the new arrangement would go into effect about the middle of that month. During the evening of August 26 Koss consulted an attorney. On August 27 she telephoned the plaintiff "at about noon" and stated that she was prepared to accept his proposal, provided that it could be arranged for on a five instead of a six-day week basis, with a proportionate reduction in the amount of salary to be paid her. The plaintiff replied that he was sorry but not having heard from her in the morning he had made arrangements for some other teacher to take her place, but that he would be glad to see her on Friday (August 29) and discuss the matter with her if she cared to meet with him. Just

prior to or after this conversation the plaintiff told another teacher to advise the bookkeeper that Koss would probably be through on the twenty-ninth. Koss did not confer with the plaintiff on the twenty-ninth, and on the thirtieth the plaintiff telephoned her and asked her to visit him and discuss the matter further. She replied that she considered herself "fired" and would talk no further. The plaintiff denied that she had been "fired" and asked her to return on Tuesday, September 2, and go about her duties as theretofore. She refused and never returned to the employ of the plaintiff. In the meantime, on August 27, the defendant Smith had telephoned to the plaintiff and told him that the existing contract between them ran until October 24, and that he was not resigning. The plaintiff said that he had not the terms of the contract in mind and requested Smith to call him again on the twenty-ninth. Smith did not do so, and the plaintiff telephoned to him on the thirty-first and told him that he had examined the contract, that it did run until October 24, and that it was agreeable to him to have Smith continue in his employ until that day. Smith replied that he considered that he had been "fired" and would not return, and he did not return. After the defendants ceased to work for the plaintiff each began to teach piano and solicited pupils attending the plaintiff's school. Koss obtained about thirty pupils, eight of whom formerly had been pupils of the plaintiff. Smith obtained about twelve pupils of whom five formerly had been pupils of the plaintiff. "The pupils thus obtained by the defendant Koss resided in Jamaica Plain, Revere, Brookline, Newton, Waltham and Andover . . . and . . . [those] thus obtained by the defendant Smith resided in Dorchester, Brookline, Newton, Needham, Medford and Lexington." The defendants "plan to continue such teaching." An exhibit incorporated in the master's report by reference and printed in the record is entitled "Distribution by Residence and Year of Study" and sets forth the residences and number of persons who had received one or more lessons as pupils of the plaintiff during the years 1938 to 1941 inclusive. The master ruled that the burden of proof that the plaintiff

did not without just cause or wrongfully discharge the defendants rested upon the plaintiff and found that he had sustained that burden.

On the basis of the subsidiary findings made by the master, he made the following ultimate findings: "I find that each defendant voluntarily offered to quit the plaintiff's employ, which offers the plaintiff duly accepted, and that thereafter when each defendant attempted to withdraw his and her offer to quit the plaintiff's employ and called the plaintiff's attention to the fact that by the terms of the written contracts of employment said contracts ran until October 24, 1941, the plaintiff offered to permit the defendants to remain in his employ pursuant to the provisions of said contracts until October 24, 1941, which offer of the plaintiff each of the defendants refused. I find therefore, so far as it is a question of fact, that the plaintiff fully performed and observed all of the terms and provisions of each contract of employment with each defendant on his part to be kept, performed and observed and that the plaintiff did not without just cause and wrongfully discharge the said defendants. I find further, so far as it is a question of fact, that neither defendant breached his or her contract with the plaintiff up to the time that their employment by the plaintiff ceased."

The defendants brought in identical objections to the master's report. The judge entered an interlocutory decree overruling the defendants' exceptions to the report and confirming the report, and a final decree enjoining the defendants for the period of three years from September 2, 1941, from teaching or engaging in the business or profession of teaching piano or conducting a piano-teaching school directly or indirectly as employer or employee; from acting in aid of any person, firm or corporation in the same or similar business or profession within the following territories: "the cities (and town) of Boston, Wellesley, Lynn, Lowell and Haverhill . . . and the areas adjacent to such cities and town for a distance of five miles measured in all directions from the boundaries of the respective cities and towns above named"; from disclosing to others the names

of pupils who studied at the plaintiff's school during the period when the defendants were in his employ, and from soliciting, canvassing or receiving the patronage of any of those pupils. The defendants' counterclaims for damages alleged to have been sustained by them by reason of having been discharged by the plaintiff without just cause before the termination of their contracts were dismissed. The defendants appealed from the interlocutory decree and from the final decree entered by the judge.

The exceptions of each of the defendants to the master's report are, in substance, that the master's ultimate conclusion that the plaintiff had sustained the burden of proving that he did not wrongfully discharge the defendants, and his ultimate findings with relation to the manner of the termination of their employment are so inconsistent with certain specified subsidiary findings of the master, that the ultimate findings cannot stand.

We think that the exceptions were overruled rightly. An analysis of all the subsidiary findings of the master discloses that in the conferences preceding the resignations of the defendants, none of the parties had made any reference to the fact that the contracts of the defendants had not then expired and would not expire prior to October 24, 1941. The conduct of the plaintiff when this was brought to his attention supports a conclusion that he did not intend to break his contract and discharge the defendants, but on the contrary that he was willing to permit each of the defendants to remain in his employ until the expiration of the term of the contracts, and expressly requested them to do so, but that they refused. It is a fair inference that, dissatisfied with the proposals made to them by the plaintiff for compensation by way of salary to take effect in October, the defendants, in order to protect themselves from the negative covenants by which they had bound themselves under the terms of the contracts, sought to create a situation under which they might contend that they had been discharged wrongfully, when the fact was otherwise. Since the master's ultimate conclusions are based solely on his subsidiary findings, we are at liberty to draw our own

inferences and conclusions from the subsidiary facts found. *Robinson* v. *Pero*, 272 Mass. 482, 484. *Hannah* v. *Frawley*, 285 Mass. 28, 31. *Busteed* v. *Cambridge Savings Bank*, 306 Mass. 9, 13. But we see no reason for disturbing the ultimate findings of the master.

The defendants have argued that the judge was without authority to issue an injunction in the case at bar, since it was based on the findings of the master, asserting that the controversy is one involving or growing out of a labor dispute as defined by G. L. (Ter. Ed.) c. 149, § 20C (inserted by St. 1935, c. 407, § 1), and that under G. L. (Ter. Ed.) c. 214, § 9A (1), (5) (inserted by St. 1935, c. 407, § 4), no judge has jurisdiction to issue an injunction in such a case, except after hearing the testimony of witnesses in open court and after findings of fact as provided in § 9A (1) (a), (b), (c), (d) and (e), are made and filed by the judge in the record of the case prior to the issuance of the injunction.

General Laws (Ter. Ed.) c. 149, § 20C (c), defines a labor dispute thus: "The term 'labor dispute,' when used in the sections hereinbefore referred to, includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange, terms or conditions of employment." We are of opinion that none of the elements thus defined as constituting a labor dispute is present in the instant case. The bill raises no issue as to the terms and conditions of employment of the defendants or any others by the plaintiff; no question concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange, terms or conditions of employment. The bill is merely one for specific performance of covenants restraining trade or competition, inserted in contracts for personal service, covenants of a character that have long been held enforceable in this Commonwealth in such cases as *Sherman* v. *Pfefferkorn*, 241 Mass. 468, *Edgecomb* v. *Edmonston*, 257 Mass. 12, *Whiting Milk Co.* v. *O'Connell*, 277 Mass. 570, *Becker College of Business Administration & Secretarial Science* v. *Gross*, 281 Mass. 355, *Suburban Coat, Apron &*

*Linen Supply Co. Inc.* v. *LeBlanc,* 300 Mass. 509, and *New England Tree Expert Co. Inc.* v. *Russell,* 306 Mass. 504, where the contract for personal service is not itself invalid, the interest to be protected is consonant with public policy, and the restraint is limited reasonably in time and space. The judge had authority to issue an injunction in accordance with the principles set forth in the cases just cited.

The remaining contentions of the defendants are (1) that the injunctive relief granted is beyond the scope of the bill, and (2) that the relief is too broad. In connection with their first contention they argue that it is clear that the "radius" mentioned in the covenants in question is to be determined from a point in Boston and in cities where "there are now or may be then established" places of business "of the studios," and that the radius contemplated by the contracts is to be measured from the location of the respective studios as its central point, and not from the boundaries of the cities or town involved. There are cases in which it has been held that "radius" was to be taken in its geometric sense of a line drawn from the centre of a circle to its periphery. So in *Johnson* v. *McIntyre,* 309 Penn. St. 191, the defendant who had agreed not to practise medicine "within the radius of fifteen miles from the Borough of Boswell," was enjoined from such practice at a place twelve and two-tenths miles distant from the plaintiff's place of business although by the nearest travelled public road the defendant's place of business was fifteen and four-tenths miles from the borough of Boswell. And in *Cook* v. *Johnson,* 47 Conn. 175, 177, it was said, "The construction suggested . . . [that a radius of ten miles from Litchfield be taken from the extreme boundaries of the town] is manifestly unnatural and unreasonable. The large extent and irregularity of the boundary lines of the town would extend the prohibited territory much further from the respondent's place of business at certain points than at others, without any reason for it founded on the extent of the good will of the business in reference to which it is to be presumed the limits were prescribed. And besides, the term 'radius,' which means 'a right line drawn or ·extending from the

centre of a circle to its periphery,' is wholly inapplicable to such a construction." On the other hand, it has been said that the word is often used metaphorically, as, for example, when we speak of the radius of a man's commercial activities, *Bloomfield Baking Co.* v. *Maluvius,* 112 N. J. Eq. 109, and the word has been defined thus: "loosely, any area bounded, or conceived of as bounded, by certain prescribed limits; as radius of commercial activity . . ." It is in this sense that we think the term was used by the parties in the contracts in the present case. Any other construction, for example, would exclude part of the city of Boston itself and part of the city of Newton, from which cities, as shown by the exhibit before referred to, one hundred thirty of the plaintiff's students were drawn in 1938, the year in which the contracts were executed, and two hundred sixty-five in 1941. It is unnecessary to enter into a detailed statement of other incongruous effects that would result from construing the word in question so that the five-mile radius would be determined by drawing a circle around the respective studios of the plaintiff as focal points. It is sufficient to say that such a construction would also exclude parts of Malden, Medford, Cambridge, Watertown, Waltham, Somerville, Revere and Dedham, and all of Arlington, Belmont, Stoneham and Milton, some residents of which cities and towns were pupils of the plaintiff in 1938 and in 1941. Other cities and towns which would thus be excluded in whole or in part, where pupils of the plaintiff resided, need not be mentioned.

We do not concur in the contention of the defendants that the relief granted by the decree appealed from was too broad, in support of which they assert that there was no finding by the master with reference to what territorial restriction was either reasonable or necessary for the protection of the plaintiff's good will; that the judge heard no evidence and made no findings as to that subject matter; and that a finding of reasonableness of the prohibition fixed in the decree could not be implied from its mere entry. This argument overlooks the facts that the master did make findings concerning the scope of the plaintiff's commercial

or professional activities, the location of his several studios, his activities in radio broadcasts and in advertising in newspapers, the location of cities and towns whence his pupils were drawn over a period of years as shown in the exhibit before referred to, and that the master incorporated in his report by reference a plan, which is before us by stipulation of the parties approved by the judge, in which are set forth the territories comprised within a five-mile radius of the several cities or towns in which the studios of the plaintiff are located. An examination of the exhibits which were before the master and the judge is sufficient to demonstrate that the conclusion of the judge with relation to the space in which the defendants should be restrained as expressed in his decree is amply supported. It may be observed that the decree does not enjoin the defendants from engaging in their business or profession in Worcester or Springfield, in which cities the plaintiff has studios, or within a five-mile radius of those cities, or in any of the cities beyond the borders of the Commonwealth in which the plaintiff has had studios since 1938. The fact that the defendant Koss never taught any pupils of the plaintiff except in the Boston studio, up to the time she left his employ, is not controlling. The restraints to be imposed in such cases are based on the rule of reasonableness, and what is reasonable depends upon the facts in each case. The present case is governed largely in principle by *New England Tree Expert Co. Inc.* v. *Russell,* 306 Mass. 504, 510, and cases there reviewed. Under the governing principles, which need not be repeated here, we are of opinion that upon the facts disclosed by the record there was no error in the decrees entered by the judge.

*Interlocutory decree affirmed.*
*Final decree affirmed with costs.*