Wilson, Paul D., J.
Plaintiff Invidia, LLC employed defendant DiFonzo as a hair stylist between April 2010 and August 2012, when she resigned and went to work, albeit briefly, for a hair salon 1.6 miles away. When she began her employment with Invidia, Ms. DiFonzo signed a Covenant Not to Compete, Non-Solicitation, and Confidentiality Agreement (the “Agreement”). In this lawsuit, Invidia alleges that Ms. DiFonzo violated that agreement when she went to work for the other salon, and, although that salon terminated Ms. DiFonzo after receiving a demand letter from Invidia, Invidia alleges that she may still be competing with Invidia in violation of the Agreement. Invidia further contends that Ms. DiFonzo is violating the non-solicitation provision of that Agreement, and is using confidential information in violation of the Agreement as well. Invidia seeks a preliminaiy injunction that, among other things, would prohibit Ms. DiFonzo from styling hair within ten miles of Invidia for two years, as set forth in the Agreement, and would order Ms. DiFonzo not to solicit Invidia clients and to surrender all confidential information of Invidia that she currently possesses.
I have reviewed materials submitted by both parties, which include, from Invidia’s side, a Verified Complaint and three affidavits of Invidia’s majority owner Phillip Patzleiner, and, from Ms. DiFonzo’s side, Ms. DiFonzo’s affidavit and an affidavit of David Pompey, the owner of David Paul Salons, Inc., the salon that briefly employed Ms. DiFonzo. In addition, I held a hearing on the preliminary injunction request, at which both parties were represented by counsel. I find that Invidia has not established the degree of likelihood of success on the merits nor the irreparable harm required for issuance of a preliminary injunction.
BACKGROUND
Ms. DiFonzo says she began work at Invidia on April 26, 2010. DiFonzo Aff. ¶2. The next day, she says, she was asked to sign the Agreement along with other documents, including a W-4 tax form, id., ¶3. The date on the Agreement is actually April 24, two days before Ms. DiFonzo started work.
The non-competition provision of this Agreement states the following:
EMPLOYEE agrees that for a period of two (2) years from last date that EMPLOYEE provides the Services [defined elsewhere as “salon services”] to INVIDIA, EMPLOYEE shall not compete with INVIDIA directly or indirectly by providing substantially the same SERVICES, or by owning, operating, consulting to, being employed by, or otherwise providing the Services to any other persons, entity or company operating in a commercial hairdressing, nail and facial salon for profit and whose business is within ten (10) mile radius of INVIDIA’S Business.
Agreement, Exhibit A to Verified Complaint, ¶ 1. In the remainder of the non-competition provision, Ms. DiFonzo acknowledges the existence of many salons outside the ten-mile radius, and agrees that the covenant not to compete would not unreasonably interfere with her livelihood.
The non-solicitation provision of the Agreement reads, in relevant part, as follows:
Nor, for the same two-year period shall EMPLOYEE solicit any of INVIDIA’S clients or customers with the intention of providing the Services or substantially similar services to such clients or customers.
Id., ¶2.
Finally, the confidentiality provision of the Agreement provides a laundry list of “INVIDIA’S valuable trade secrets,” including “customer lists, accounts . . .” Ms. DiFonzo agrees in that provision “not to disclose, discuss, publish, disseminate, or otherwise make known to any other third person any of INVIDIA’s valuable trade secrets at any time without the express written permission of INVIDIA.” Id., ¶3.
On or about August 18, 2012 Ms. DiFonzo telephoned Mr. Patzleiner to announce that she was resigning her position at Invidia. Patzleiner Aff. ¶12. By the time she resigned from Invidia, Ms. DiFonzo says, she had long since forgotten that she had signed the Agreement, which she had not understood in the first *392 place. Id., ¶3. She also has said under oath that she did not take any Invidia customer lists or other confidential information, and has not solicited a single Invidia customer. Id., ¶6. She does not dispute Mr. Patzleiner’s statement that David Paul Salons, where she accepted employment, is located in Sudbury, the same town as Invidia, about 1.6 miles away on the same street. Patzleiner Aff. ¶19.
When Invidia learned, almost immediately, that Ms. DiFonzo was going to work at David Paul Salons, it had its attorney send letters to both Ms. DiFonzo and David Paul Salons, expressing its intention to enforce the Agreement. See Exhibits B, C, and D to the Verified Complaint. Ms. DiFonzo’s employment at David Paul Salons lasted from August 20, 2012 to September 1, 2012. Pompey Aff. ¶¶4, 6. Ms. DiFonzo believes that David Paul Salons “fired” her on September 1, see DiFonzo Aff. ¶7, although Mr. Pompey, the owner of David Paul Salons, says that he told Ms. DiFonzo “to take time off from David Paul and return if she could get things straightened out with Mr. Patzleiner” of Invidia. Pompey Aff. ¶6. Mr. Pompey says that he took this action “solely [because of] the threats I received from Mr. Patzleiner” of Invidia, after a discussion with Mr. Patzleiner in which Mr. Patzleiner said that “he did not care” whether Ms. DiFonzo would solicit Invidia’s customers, but rather “he ‘needed to send a message’ to his other employees.” Pompey Aff. 16.
DISCUSSION
“A party seeking a preliminary injunction must show that (1) success is likely on the merits; (2) irreparable harm will result from denial of the injunction; and (3) the risk of irreparable harm to the moving party outweighs any similar risk of harm to the opposing party.” Cote-Whitacre v. Department of Pub. Health, 446 Mass. 350, 357 (2006) (Spina, J., concurring), citing Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). Here, to warrant issuance of a preliminary injunction against Ms. DiFonzo, Invidia must show, first, a likelihood that it will prevail at trial in showing that the non-competition, non-solicitation and confidentiality provisions in the Agreement are enforceable and that Ms. DiFonzo has violated those provisions, and second, that in the absence of an injunction, Invidia will suffer harm sufficiently severe and irreparable to outweigh the harm that an injunction will impose on Ms. DiFonzo.
In performing this analysis, courts are mindful that “[c]ovenants not to compete are valid if they are reasonable in light of the facts in each case.” Boulanger v. Dunkin’ Donuts, Inc., 442 Mass. 635, 639 (2004), citing Marine Contrs. Co., 365 Mass. at 287, and Saltman v. Smith, 313 Mass. 135, 145 (1943). Non-competition agreements “are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood.” Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982).
1. The Non-Competition Provision
Invidia is likely to succeed in its claim that Ms. DiFonzo breached the non-competition provision of the Agreement during the week or so that she was employed by David Paul Salons, which is located well within the geographically-forbidden 10 miles of Invidia’s location. The affidavit of Mr. Pompey, the owner of David Paul Salons, makes clear his interest in re-employing Ms. DiFonzo “[w]ith court approval,” Pompey Aff. ¶7, so Ms. DiFonzo may well have the opportunity to violate that provision in the future as well.
However, Invidia also must establish that success is likely on its claim that the non-competition provision is enforceable against Ms. DiFonzo. Ms. DiFonzo attacks the enforceability of the covenant on two theories.
First, Ms. DiFonzo argues that Invidia gave her no consideration for her execution of the agreement. Ms. DiFonzo says that she signed the Agreement after she had already commenced work, but this argument is inconsistent both with the date on the Agreement and with her own sworn testimony that she was presented with the Agreement along with her tax withholding form,. DiFonzo Aff. ¶3, a document routinely signed at the beginning of an employment relationship. So the job offer itself was likely the consideration for her execution of the Agreement.
Ms. DiFonzo also argues that her job changed six weeks after she was hired, when she became a full-time employee and obtained health insurance through Invidia. That change in the employment relationship, Ms. DiFonzo says, voided the Agreement and required Invidia to have her execute a substitute Agreement in connection with her “new” job. But even if Ms. DiFonzo establishes these facts — and there is disputed evidence about the nature and implications of the health insurance coverage — the change to a full-time schedule and the provision of health insurance is not the type of material change in the employee’s duties that was held, in the case cited by Ms. DiFonzo, to result in the voiding of a non-competition agreement applicable to the “old” job. In Lycos, Inc. v. Jackson, 2004 WL 2341335 (Mass.Super. 2004) [18 Mass. L. Rptr. 256], the court concluded that a different employment relationship was created when there were changes to the employee’s job title, responsibilities, salary and bonus eligibility, and number of people reporting to her. Moreover, the employer had implicitly acknowledged a material change in their relationship by asking her to sign a new offer letter when her job changed so dramatically. No such changes occurred here.
“A covenant not to compete is enforceable only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest.” Boulanger v. Dunkin’ Donuts, *393 Inc., 442 Mass. 635, 639 (2004), citing Marine Contrs. Co. v. Hurley, 365 Mass. 280, 287-88, 289 (1974), and All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). Ms. DiFonzo’s second attack on the enforceability of the non-competition provision is to suggest that it acts not to protect a legitimate business interest of Invidia, but rather to deprive Ms. DiFonzo of the ability to capitalize on the goodwill that she herself has developed in working with clients. (In addition to goodwill, a non-competition agreement can serve to protect other employer interests, such as its confidential information; in this case those interests are directly protected by the non-solicitation and confidentiality provisions of this Agreement, and will be discussed separately, below.)
Invidia argues with fervor that the only goodwill at stake belongs to Invidia, which took a “novice” hairdresser, who had been out of the industry for a year and a half before coming to work at Invidia, Patzleiner Aff. ¶7, and gave her “advanced education and training . . . unprecedented in the salon industry,” id., ¶9, including allowing her to attend “10 private education events in the presence of celebrities and national platform stylists.” Id., ¶10. She came to Invidia with no clients, Invidia says, id., ¶8, and after two years is well-positioned to use her skills, developed at Invidia’s expense, to serve clients elsewhere who were presented to her by Invidia.
Invidia’s owner states that “(t]he Salon and Beauty industry depends to a large extent on customer loyalty and repeat business and referrals. In my 10 years of experience in this industry, I have observed that in order to build a solid clientele base, it requires at least a year of consistent customer interaction. This is because of the typical number of weeks and months between customer appointments.” Patzleiner Sup. Aff. ¶6. But when those customers return to the salon, they may well be returning out of “loyalty” to the individual hair stylist rather than to the salon itself. As another judge of this court has observed in a similar case, “Hairdressers are not fungible; each employs individual skills and techniques that may, or may not, meet the needs and preferences of an individual client.” Lunt v. Campbell, 2007 WL 2935864 (Mass.Super. 2007) [23 Mass. L. Rptr. 145). The nature of a hair stylist’s relationships with her customers is such that it can be difficult to determine whose goodwill is being created as she pleases those customers enough to convince them to return to the salon for future visits. Given the nature of this industry, the question of whether this particular non-competition provision protects the employer’s goodwill is a difficult one, as to which Invidia’s theory may or may not ultimately carry the day.
Another element of the non-competition agreement bolsters the conclusion that Invidia has failed to show that the non-competition agreement will be found enforceable. “A covenant not to compete must be no more restrictive than necessary.” Boulanger, 442 Mass. at 643, citing Marine Contrs. Co., 365 Mass. at 287-88. In this case, a question arises about whether it is reasonable to require Ms. DiFonzo not to compete for two years, particularly because Invidia’s owner presented a report that indicated that “clients regularly serviced by DiFonzo frequent the salon at a rate of once every 9 weeks on average for a total of 5.5 visits per year.” Patzleiner Rebuttal Aff. ¶8. Whether the two-year restriction, or for that matter the 10-mile restriction, is too broad to be enforceable may be another issue at trial. However, I need not rest my decision on those elements of the Agreement, in light of my conclusion that Invidia has failed to establish that the non-competition provision will be found enforceable because it protects goodwill that belongs entirely, or even largely, to Invidia.
In addition, Invidia has not established that it will suffer irreparable harm from competing with Ms. DiFonzo. Invidia’s submissions demonstrate that it is able to calculate with reasonable certainty the financial loss it will suffer, at least in the short term, for each client it loses to Ms. DiFonzo. See Patzleiner Aff. ¶27 (“The average client appointment serviced by Ms. DiFonzo had a value in this company of approximately Eighty-Seven dollars and sixteen cents ($87.16) and represented annual revenue to Invidia of an average of approximately $938.25 per client”), supported by Ex. A to Patzleiner Sup. Aff. at 2. As a result, money damages should be sufficient to compensate Invidia if it prevails at trial in establishing a breach of the non-competition provision.
2. The Non-Solicitation and Confidentiality Provisions
To be entitled to an injunction concerning non-solicitation, Invidia must again establish that it is likely to prevail at trial in showing that the non-solicitation provision is enforceable and that Ms. DiFonzo violated it. The non-solicitation provision is clearly intended to protect Invidia’s client list, which is the confidential information Invidia asserts was improperly used, or perhaps turned over to David Paul Salons, by Ms. DiFonzo. That is a legitimate business interest, and as a general matter Invidia is entitled to enforcement of the non-solicitation and confidentialiiy provisions.
However, at this early stage, the evidence that Ms. DiFonzo solicited Invidia’s clients, or misused its confidential information, is thin. Invidia first cites the case of its client Wendy Goodwin Kaiser. Four days after Ms. DiFonzo resigned from Invidia, David Paul Salons, her new employer, posted a “public announcement” on Ms. DiFonzo’s Facebook page, noting DiFonzo’s new affiliation with David Paul. Patzleiner Aff. ¶20. In the comment section below that post, Ms. Kaiser posted a comment which said, “See you tomorrow Maren [DiFonzo]!” Id. Ms. Kaiser then canceled her appointment at Invidia for the next day. But it does not constitute “solicitation” of Invidia’s customers to post a notice on *394 Ms. DiFonzo’s Facebook page that Ms. DiFonzo is joining David Paul Salons. It would be a veiy different matter if Ms. DiFonzo had contacted Ms. Kaiser to tell her that she was moving to David Paul Salons, but is no evidence of any such contact.
Invidia next points out that Ms. DiFonzo has become Facebook “friends” with at least eight clients of Invidia. Again, one can be Facebook friends with others without soliciting those friends to change hair salons, and Invidia has presented no evidence of any communications, through Facebook or otherwise, in which Ms. DiFonzo has suggested to these Facebook friends that they should take their'business to her chair at David Paul Salons. Id., ¶22.
Finally, Invidia has prepared a report indicating that 90 Invidia clients, formerly served by Ms. DiFonzo, “either did not keep his or her scheduled appointment, canceled, or failed to schedule a future appointment” since August 18, 2012, the day of Ms. DiFonzo’s resignation. Invidia’s owner characterizes this state of affairs as an “unprecedented . . . wave of no-shows, cancellations or non responses.” Patzleiner Sup. Aff. ¶¶10-11. But, once again, Invidia has presented no evidence that anyone of these 90 people has been contacted by Ms. DiFonzo, because, “For many reasons, [Invidia] cannot simply telephone these clients and ask them whether they have been solicited by DiFonzo.” Id., ¶12. Moreover, Invidia does not explain why Ms. DiFonzo is to blame that these 90 clients may have stopped coming to Invidia at a time when, as far as the record shows, Ms. DiFonzo is apparently unemployed and therefore unable to serve them herself.
Invidia’s owner states that Facebook “is a significant channel of communication between Invidia and its clients.” Patzleiner Aff. §22. If these 90 clients are accustomed to communicating with Invidia through Facebook, they are probably Facebook-sawy enough to locate Ms. DiFonzo’s Facebook page after she left Invidia. So long as they reached out to Ms. DiFonzo and not vice versa, there is no violation of the non-solicitation provision of the Agreement.
Ms. DiFonzo has sworn under oath that “I did not solicit a single [Invidia] customer,” DiFonzo Aff. ¶6, and “I have not solicited anyone to leave Invidia or visit David Paul since I was let go.” Id., ¶9. In similar fashion, the president of David Paul Salons has stated that Ms. DiFonzo “certainly hasn’t solicited anyone to visit my salon since I was forced to let her go.” Pompey Aff. ¶5. Perhaps these latter two statements leave open the possibility that Ms. DiFonzo actually did solicit Invidia customers during the week or so before she was let go by David Paul Salons. However, Mr. Pompey adds that she “did not need to do so . . . [because] David Paul planned to keep her busy on a full-time basis serving customers it alone generated,” id.., ¶4, and Ms. DiFonzo’s more definitive statement in paragraph 6 says that she never solicited anyone at any time.
Invidia says that it has very good reasons not to highlight Ms. DiFonzo’s departure, or its lawsuit against her, by calling its clients or former clients to ask them if they have been solicited by Ms. DiFonzo. However, by failing to make those calls, Invidia has undercut its ability to prove any violation of the non-solicitation .or confidentiality provisions of the Agreement sufficient to justify a preliminary injunction. By the time of trial, Invidia may well have changed its mind about whether to inquire of its clients or former clients. But, without evidence from its clients that Ms. DiFonzo has solicited them, .Invidia has so far failed to make a showing of likelihood of success-on the merits on its claim that Ms. DiFonzo has violated the non-solicitation or confidentiality provisions.
CONCLUSION and ORDER
For the reasons stated above, I DENY Invidia’s Motion for Preliminary Injunction.