# DISTRICT 1199E, NATIONAL UNION OF HOSPITAL AND HEALTH CARE EMPLOYEES, DIVISION OF R.W.D.S.U., AFL-CIO *v.* THE JOHNS HOPKINS HOSPITAL

[No. 89, September Term, 1981.]

*Decided May 5, 1982.*

344

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*H. Victoria Hedian,* with whom were *Bernard W. Rubenstein* and *Edelman & Rubenstein, P.A.* on the brief, for appellant.

*Jeffrey P. Ayres,* with whom were *N. Peter Lareau, Peter E. Keith* and *Venable, Baetjer & Howard* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

This case arises out of a labor conflict between Johns Hopkins Hospital (Hopkins), a nonprofit, tax-exempt health care institution, and District 1199E (the Union), the collective bargaining representative for approximately 1,250 service and maintenance employees of the hospital. The single issue presented is whether the Maryland Anti-Injunction Act (the Act), Maryland Code (1957, 1979 Repl. Vol.), Art. 100, §§ 63-75, applies to nonprofit hospitals.

Enacted in 1935, the Act was modeled on the federal Norris-LaGuardia Act, 29 U.S.C.A. § 101 *et seq.* Its main purpose, like that of its federal counterpart, was to place restrictions on the power of equity courts to grant injunctions in labor disputes. This purpose "reflect[ed] the feeling in this country during the 1930's that courts of equity were unduly hampering the labor movement by enjoining necessary and proper union activities, especially by means of *ex parte* injunctions." Cohen, *The Maryland Law of Strikes, Boycotts, and Picketing,* 20 Md. L. Rev. 230, 239 (1960). *See also Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. Co.,* 321 U.S. 50, 64 S. Ct. 413, 88 L. Ed. 534 (1944). *Ex parte* injunctions were viewed as "necessarily alter[ing]" the status quo in a labor dispute. Art. 100, § 67 (1).

The Act contains in § 63 a declaration of the public policy of the State, *i.e.:*

> "Negotiations of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize *in the corporate and other forms of capital control.* In dealing with such employers the individual unorganized worker is helpless to exercise actual liberty of contract, and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint or

coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (Emphasis supplied.)

In its attempt to maintain the status quo in labor disputes, the Act not only prohibits *ex parte* injunctions, but it requires detailed notice, hearing and specified fact-finding procedures before any injunction may issue. The heart of the Act is found in the provisions of § 68, which prohibit a court from issuing a temporary or permanent injunction

"in any case *involving or growing out of a labor dispute* ... except after hearing the testimony of witnesses in open court, (with opportunity for cross-examination) in opposition thereto, if offered, and except after findings of all the following facts by the court or judge or judges thereof;

(a) *Acts committed.* — That unlawful acts have been threatened or committed and will be executed or continued unless restrained;

(b) *Injury — In general.* — That substantial and irreparable injury to complainant's property will follow unless the relief requested is granted;

(c) *Same — Extent.* — That as to each item of relief granted greater injury will be inflicted upon complainant by the denial thereof than will be inflicted upon defendants by the granting thereof;

(d) *Jurisdiction.* — That no item of relief granted is relief that a court or judge thereof has no jurisdiction to restrain or enjoin under § 65 of this article;

(e) *No remedy at law.* — That complainant has no adequate remedy at law; and

(f) *Failure to protect property.* — That the public officers charged with the duty to protect complainant's property have failed or are unable to furnish adequate protection.

(g) *Notice of hearing.* — Such hearing shall be

held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to those public officers charged with the duty to protect complainant's property." (Emphasis supplied.)

Section 68 (h) provides that even if it is alleged that a substantial and irreparable injury to the complainant's property will occur unless a temporary restraining order is issued before the hearing, nevertheless such an order cannot be granted for at least 48 hours after the expiration of notice of the application for the order. Section 74 (a) provides that a case is one "involving or growing out of a labor dispute" within the contemplation of § 68 if it

"involves persons who are engaged in a single industry, trade or craft, or occupation; or who are employees of one employer; or who are members of the same or an affiliated organization of employers or employees, whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interest in a 'labor dispute (as hereinafter defined) of persons participating or interested' therein . . . ."

A "labor dispute" is defined in § 74 (c) as

"any controversy concerning terms or conditions of employment, or concerning the association or representations of persons in negotiation, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations or any other controversy arising out

of the respective interests of employer or employee, regardless of whether or not the disputants stand in the proximate relation of employer or employee."

I

On November 30, 1980, the collective bargaining contract between Hopkins and the Union expired. A strike ensued, and on December 1, 1980, the Union set up picket lines at the various entrances to the hospital. Eleven arrests, most for disorderly conduct or failure to obey a police officer's order, were made on the picket lines that morning. Later that day, Hopkins filed a "Verified Bill of Complaint for a Temporary Restraining Order and *Ex Parte* Injunction, and Temporary, Interlocutory and Permanent Injunction" in the Circuit Court No. 2 of Baltimore City. In pertinent part, the bill averred that

"Respondents and those acting in concert with them have engaged in ... unlawful acts since picketing began .... More than 400 pickets have continually engaged in mass picketing, blocking of ingress and egress, obstruction, threats and intimidation ...."

The bill also stated that these "acts of violence, physical assaults and threats ... will continue ... unless restrained"; that if these acts "are permitted to continue ... the potential for substantial and irreparable violence and injury to [Hopkins'] property and the public welfare is great"; and that "unless [the pickets] are restrained ... [Hopkins] will be unable to perform its obligations to provide the citizenry of Baltimore and many other areas with necessary health and medical care." Therefore, Hopkins sought an *ex parte* order enjoining "[p]icketing in mass," "[o]bstructing or attempting to obstruct, threatening, intimidating, warning, assaulting, blocking, pushing, [or] molesting ... any employee or any other persons lawfully seeking to enter or leave [Hopkins'] facilities." Hopkins also sought an order that only two pickets be allowed at any entrance and that the Union be required to produce the names of those authorized to picket.

That same day, the court (Hammerman, J.) ruled that the Maryland Anti-Injunction Act was inapplicable to a labor dispute involving a nonprofit hospital. In so concluding, the court relied primarily on *Western Pennsylvania Hospital v. Lichliter,* 340 Pa. 382, 17 A.2d 206 (1941). In addition, the court expressed the view that the Act's declaration of policy, as set forth in § 63, indicated a legislative intention at the time of enactment to limit the Act's provisions to private, profit-making employers, viz, "the corporate or capital employer." Accordingly, the court, pursuant to Maryland Rule BB 72,[1] signed an *ex parte* injunction granting, in part, the relief sought by Hopkins. The court's order, which was subsequently modified in several particulars, provided that a full hearing would be promptly scheduled on the merits of Hopkins' bill.

At the evidentiary hearing held on December 5, 1980, Hopkins called numerous witnesses, primarily city police officers and its own in-house security personnel, to demonstrate the continued need for the injunction. These witnesses described specific instances of disorder and disruption on the picket lines, and testified to the instability and tension generated by the strike. The Union presented no witnesses, but cross-examined the police officers in an attempt to show that they were in control of the situation and that the injunction was not necessary. The court thereafter issued an interlocutory injunction restraining the Union's picketing and other activities on terms similar to those imposed by the *ex parte* injunction. It said that large masses of pickets

> "could intimidate visitors from coming. And I think visitors coming to visit patients is an important part of therapy to patients in a hospital, particularly for people who are dying and loved ones want to come to see them and where it's extremely important. Visits are important to the therapy of a hos-

---

1. Since the Act only covers "labor disputes," *ex parte* injunctions still may be obtained in proceedings not covered by the Act. Indeed, unlike an injunction obtained pursuant to the Act, *ex parte* injunctions can be obtained virtually immediately, and without extensive procedural prerequisites.

pital. Volunteers coming into work to keep the hospital functioning, these are volunteers, they could say, I don't need this. And this could have a very deleterious effect on the proper maintenance and opening of the hospital."

The Union promptly appealed to the Court of Special Appeals. That court, in an unreported opinion, noted that shortly after the interlocutory injunction issued the strike was settled and therefore dismissed the appeal as moot. We granted certiorari solely to determine whether the Act applies to nonprofit hospitals.[2]

## II

The Union contends that the chancellor erred in not requiring compliance by Hopkins with the Act's fact-finding and timing requirements. The Union argues that the *ex parte* injunction was void *ab initio* because the chancellor acted without jurisdiction. Hopkins, on the other hand, maintains that since the Act does not specifically include nonprofit hospitals within its ambit, they are not bound by the strictures of the Act, and therefore the chancellor correctly issued the *ex parte* injunction. Hopkins points out that the Act, being in derogation of the common law, and a deprivation of the court's jurisdiction, must be strictly construed. Furthermore, Hopkins argues that as a cardinal rule of statutory construction, the court must consider the purpose of a statute in discerning its meaning. It maintains that the Act's governing purpose is clear from the declaration of policy set forth in § 63, namely, that it is limited to employers organized "in the corporate and other forms of capital control." The Act, Hopkins argues, was intended only to benefit employees who dealt with "such employers," *i.e.,* those in profit-making private industry, not nonprofit hospitals, since employees of the latter "simply did not and do

---

2. This case obviously falls within the rule that "an appeal, even though moot, will not be dismissed where the urgency of establishing a rule of future conduct in matters of important public concern is both imperative and manifest." State v. Ficker, 266 Md. 500, 507, 295 A.2d 231 (1972). *See* Reyes v. Prince George's County, 281 Md. 279, 380 A.2d 12 (1977); Lloyd v. Supervisors of Elections, 206 Md. 36, 111 A.2d 379 (1954).

not work ... for employers organized in the 'corporate and other forms of capital control.' " [3]

Hopkins also cites the principles of *noscitur a sociis* and *ejusdem generis* for the proposition that the word "industry," as used in § 74 (a) of the Act, necessarily precludes Hopkins from being involved in a "labor dispute" within the meaning of § 74 (c) because Hopkins is not engaged in an "industry." [4] The term, "industry," according to Hopkins, as used in § 74 (a), limits all broader subsequent language contained in the section.

Additionally, Hopkins contends that employees of a nonprofit hospital should be treated the same as public employees and consequently forbidden to strike unless expressly authorized to do so. Succinctly, Hopkins argues that

> "absent clear legislative direction to the contrary, Maryland non-profit hospitals should not be sub-jected to violent labor disputes for one instant, much less for 48 hours. Perhaps even more impor-tantly, the public, patients and visitors should not be subjected to violent labor disputes at non-profit hospitals for one instant."

### III

Hopkins cites cases from other jurisdictions to support its statutory construction and policy arguments. The facts of these cases are similar to those in the instant case — a union seeks either to represent employees of a nonprofit hospital or to obtain a new collective bargaining agreement for employees it already represents. To accomplish these goals,

---

**3.** Hopkins supports this assertion with a dictionary definition of "capital" as "[a]ccumulated goods, possessions, and assets, used for the production of profit and wealth." Black's Law Dictionary, at 189 (5th ed. 1979).

**4.** Under the doctrine of *noscitur a sociis,* "the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it." Black's Law Dictionary, at 956 (5th ed. 1979). "[T]he 'ejusdem generis rule' is, that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." *Id.* at 464.

and to prevent the employer from enjoining its activities, the union seeks the protection of the jurisdiction's Anti-Injunction Act.

### (A)

In *Jewish Hospital of Brooklyn v. Doe,* 300 N.Y.S. 1111, 252 App. Div. 581 (1937), a New York intermediate appellate court held that a charitable hospital with a large percentage of indigent patients was not subject to the restrictions of New York's Anti-Injunction Act. That Act, like the Maryland Act, provides that a "case grows out of a labor dispute" when it

> " 'involves persons who are engaged in the same industry, trade, craft or occupation, or who are employees of one employer.' "
> 300 N.Y.S. at 1114.

The New York court held that even though the statute did not expressly exempt charitable corporations, the legislature never intended that it would apply to nonprofit hospitals. The court said:

> "While those involved in a labor dispute, as defined by the statute, need not stand in the relation of employer and employee, they must be engaged in the same 'industry, trade, craft or occupation.' These words connote and emphasize one common thought, to wit, that the parties to the controversy shall be engaged in the same business enterprise or commercial pursuit; one motivated by the desire for profit, the other by the desire to earn a livelihood. Plaintiff is not thus engaged, nor are its sponsors or supporters moved by any selfish or pecuniary consideration. Plaintiff's function primarily — perhaps exclusively — is charitable: To care for the sick and disabled and to relieve their suffering and distress whether they are or are not able to pay for the service they receive. While some patients pay, most are unable to do so; and during the last several years the voluntary contributions plus the city's

payments have been insufficient to meet the operating expenses. Obviously plaintiff is not engaged in any industry, trade, craft, or occupation for profit within the meaning of the statute." *Id.* at 1116.

In deciding that nonprofit hospitals were not encompassed within the statute's provisions, the court expressed the belief that such institutions perform a governmental function. It said that the hospital

"in caring for the indigent sick, is discharging, at least in part, a function which ordinarily devolves upon the government. The city sends to it 'free patients,' for whose treatment it is only partly reimbursed by the city. To the extent that it renders such service plaintiff is in fact, if not in name, a governmental agency performing a governmental function which ordinarily belongs to and usually is discharged by the state." *Id.* at 1117 (citations omitted).

Noting the rule of statutory construction that a statute neither binds nor includes governmental entities unless specifically covered by the statute, the court concluded that, as the Jewish Hospital was an arm of the government, it was exempt from the statute's provisions. *Id.* at 1117-18.

Moreover, the court read the New York Act *in pari materia* with the state's Labor Relations Act which was expressly made inapplicable to charitable associations. *Id.* at 1118-19.[5] Thus bolstered, the court opined:

"It is unnecessary to describe the hardship, suffering, and disaster that would follow if the instant statute, with the delay which its requirements entail, were held applicable to a

---

**5.** New York's Labor Relations Act, like that of many other states and the National Labor Relations Act, governs collective bargaining procedures. However, Labor Relations Acts (sometimes called employment peace acts) do not generally deal with injunctions.

charitable corporation such as plaintiff."
*Id.* at 1119.

Similarly, in *Western Pennslyvania Hospital v. Lichliter,* 340 Pa. 382, 17 A.2d 206 (1941), the Supreme Court of Pennsylvania adopted, affirmed, and quoted in full the opinion of a lower court which had held that Pennsylvania's Anti-Injunction Act did not apply to nonprofit charitable hospitals. The lower court's ruling was based on a tripartite finding that

(1) Hospitals are not industries,

(2) Pennsylvania's Anti-Injunction Act (like Maryland's) only applied to "labor disputes," and

(3) Since "labor disputes," by definition, involved only "persons who are engaged in a single *industry,* trade, craft, or occupation," the hospital could not be part of a "labor dispute."

The court found that the hospital was not involved in a "trade, craft, or occupation," stating:

"even though the words used might conceivably be broad enough to include a hospital, nevertheless, a hospital is not within the spirit of the Act, and not being within the spirit, the Act does not apply to it." 17 A.2d at 209.

Finally, in considering whether the Pennsylvania Labor Relations Act applied to the conflict between the hospital and the union, the court held, as in *Jewish Hospital, supra,* that the hospital performed a government function and was therefore beyond the scope of the Act. *Id.* at 210. *Accord, Petition of Salvation Army,* 349 Pa. 105, 36 A.2d 479 (1944) (eleemosynary institutions are not within the ambit of statutes regulating industrial disputes).[6]

---

**6.** *See also* St. Luke's Hospital v. Industrial Commission, 142 Colo. 28, 349 P.2d 995 (1960) (en banc) (private nonprofit hospital was not an industrial activity and therefore was not subject to collective bargaining provisions of Colorado's Labor Peace Act); St. Luke's Hospital v. Labor

(B)

Courts in other states have held that nonprofit hospitals, like any other employer, are covered by Anti-Injunction Acts. Illustrative of these cases is *Peters v. South Chicago Community Hospital,* 44 Ill.2d 22, 253 N.E.2d 375 (1969), where the Supreme Court of Illinois held that nonprofit hospitals were not exempt from the requirements of that state's Anti-Injunction Act. It noted that the language of the statute "is clear and it makes no exceptions for hospitals." 253 N.E.2d at 378. The court commented that unlike the "proper and efficient education of children," the operation of a hospital is not imbued with "an overriding public interest of such importance as to transcend the rights of custodial workers to strike or picket." *Id. Accord, County of Peoria v. Benedict,* 47 Ill.2d 166, 265 N.E.2d 141 (1970) *cert. denied,* 402 U.S. 929, 91 S. Ct. 1524, 28 L. Ed. 2d 862 (1971) (employees of county nursing home were protected by Anti-Injunction Act).

Similarly, in *Peters v. Poor Sisters of Saint Francis Seraph,* 148 Ind. App. 453, 267 N.E.2d 558 (in banc), *transfer denied,* 257 Ind. 360, 274 N.E.2d 530 (1971), the intermediate appellate court of Indiana held that Indiana's Anti-Injunction statute applied to charitable hospitals. The trial court had ruled that the Act did not apply and granted the hospital's request for a temporary restraining order enjoining the union from picketing and striking. On appeal, the court reversed, finding no merit in the hospital's contention that it was not involved in a "labor dispute" within the meaning of the Act. Furthermore, the court declined to follow the reasoning of *Lichliter, Jewish Hospital* and *St. Luke's Hospital,* all *supra,* stating:

> "[T]he principal purpose of the act is to safeguard the interest of the three groups concerned with labor relations, that is, the public, the employer, and the employee; that

Relations Commission, 320 Mass. 467, 70 N.E.2d 10 (1946) (hospital organized as public charitable institution was not covered by State Labor Relations Act).

> instead of promoting strikes the real purpose of the act is to provide new methods of peacefully settling disputes which may arise and thus prevent strikes, and that there can be no greater hazard to the lives of patients in the hospital under the statute than there was before its enactment. Labor and sweat, hours, wages, and the desire to be important as individuals are much the same whether they exist in a charitable hospital or an industrial plant. There seems to be no reason why the position and rights of workers in a hospital are not just as important to the well being of the whole community as those of any other employees."
> *Id.* at 567.

The court also rejected the hospital's argument that its employees should be considered "public employees" and therefore not covered by the Act. The court found that neither the hospital's tax-exempt status nor its receipt of public funds transformed it from a private hospital into a public one. Finding none of the hospital's other contentions persuasive, the court stated:

> "Since the Indiana General Assembly has not seen fit to specifically exempt charitable hospitals from the operation of this Act we do not believe that it is permissible for us to do so." [7]
> *Id.* at 567-68.

In *Northwestern Hospital v. Public Bldg., Etc., No. 113,* 208 Minn. 389, 294 N.W. 215 (1940), a nonprofit hospital unsuccessfully claimed exemption from an Anti-Injunction

---

7. In denying a petition for transfer, the Indiana Supreme Court discussed the *Jewish Hospital* "governmental function" exception and stated:

> "We merely point out that the factual situation might well be such that the hospital did in fact perform a governmental function, even though it is a private organization. In so far as the Appellate Court opinion purports to hold that private organizations are in every instance governed by the terms of the Indiana [Anti-Injunction Act], it is disapproved." 274 N.E.2d at 531.

Act on the ground that its functions concerned a service to mankind which could not be disrupted under any circumstances. Initially, the Minnesota Supreme Court, referring to the state's Labor Relations Act, rejected the holdings of *Jewish Hospital* and *Lichliter, supra,* ruling that the relationship between hospitals and the state was not sufficient to bring the hospital within the exemption for " 'the state or any political or governmental subdivision.' " 294 N.W. at 217. The court stated:

> "The position and rights of employes in a hospital are as important to the well-being of the whole community as that of a technical industrial employe. The simple fact is that employes are dependent upon their positions for a livelihood. This is true whether the employer is a charitable hospital or an automobile manufacturer." *Id.* at 218.

As to Minnesota's Anti-Injunction Act, the court combined these reasons with the Act's broad definition of a "case growing out of a labor dispute," [8] to hold that "[i]t seems self-evident that [hospital] maintenance and non-professional employes are within the statute." *Id.* at 218.[9]

---

**8.** The definition provided that

> " 'A case shall be held to involve or to grow out of a labor dispute when the case involves persons * * * engaged in the same industry, trade, craft or occupation; * * * or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; * * *' " *Id.* at 218.

**9.** *See also* Utah Labor Relations Board v. Utah Valley Hospital, 120 Utah 463, 235 P.2d 520 (1951) (nonprofit charitable hospital was not excluded from State Labor Relations Act); Wisconsin Emp. Rel. Board v. Evangelical Deaconess Soc., 242 Wis. 78, 7 N.W.2d 590 (1943) (Wisconsin's Employment Peace Act does not exempt from its provisions charitable institutions, such as church society organized as nonprofit corporation and maintaining hospital).

Additionally, the United States Court of Appeals for the District of Columbia has also held that a charitable hospital is not exempt from the National Labor Relations Act. National Labor Rel. Board v. Central Disp. & E. Hosp., 145 F.2d 852 (D.C. Cir. 1944), *cert. denied,* 324 U.S. 847, 65 S. Ct. 684, 89 L. Ed. 1408 (1945). This decision was legislatively changed in

## IV

In light of the cases, we think it clear that courts which hold that nonprofit hospitals are exempt from anti-injunction acts have done so on three premises:

(1) Nonprofit hospitals are an arm of the government and therefore fall within the implied statutory exemption for governmental agencies;

(2) Nonprofit hospitals are not "industries" and therefore cannot be involved in a "labor dispute" within the meaning of an Anti-Injunction Act; and

(3) Even if the language of an Anti-Injunction Act logically includes a nonprofit hospital, public policy provides an implied exemption.

Hopkins argues that each of these premises should be read into the declaration of policy set forth in § 63 of the Maryland Act. As to the first premise, while it may be true that nonprofit hospitals are "governmental agencies" in other jurisdictions, it is simply not true in Maryland. Indeed, it is a well-settled proposition in this State that a tax-exempt hospital, although operated solely for the benefit of the public and not for profit, is nevertheless a private institution. *Levin v. Sinai Hosp. of Balto.,* 186 Md. 174, 46 A.2d 298 (1946). *Accord, Baltimore Co. Hosp. v. Md. Hosp.,* 234 Md. 427, 200 A.2d 39 (1964); *Shulman v. Washington Hospital Center,* 222 F. Supp. 59 (D. D.C. 1963). *See also Modaber v. Culpeper Memorial Hospital, Inc.,* 674 F.2d 1023 (4th Cir. 1982) (50 L.W. 2579, 4/6/82) (public funding for private nonprofit hospital which subjects recipients to considerable state and federal regulation does not constitute state action).

---

1947 when the Taft-Hartley Act (the Labor Management Relations Act, 61 Stat. 137) excluded nonprofit hospitals from the term "employer." 29 U.S.C.A. § 152(2) (1973 ed.). However, the Senate Committee on Labor and Public Welfare "could find no acceptable reason why 1,427,012 employees of these non-profit, non-public hospitals, representing 56% of all hospital employees, should continue to be excluded from the coverage and protections of the [National Labor Relations] Acts," S. Rep. No. 93-766, 93rd Cong., 2d Sess. 3 (1974), reprinted in 2 (1974) U.S. Code Cong. & Ad. News 3946, 3948. Therefore, Congress once again amended the Act to remove the exemption for nonprofit hospitals. Pub. L. 93-360, 88 Stat. 395, 29 U.S.C.A. § 152(2).

As to the second premise, Hopkins is undeniably a member of the health care industry. Although "health care" may not have been considered an industry in 1935 when the Act was passed, "health care industries" are part of common parlance today. Of course, "industry" is included as only one component of the § 74 (a) formulation which defines a "case growing out of a labor dispute." Plainly, it is beyond peradventure — even taking the tenets *noscitur a sociis* and *ejusdem generis, supra,* into account — to suggest that Hopkins' employees are not engaged in a "trade or craft, or occupation," or that they are not "employees of one employer" or "members of the same or an affiliated organization of . . . employees." § 74 (a).

The third premise is equally flawed. That the declaration of policy contained in § 63 of the Act refers to employers organized in the "corporate and other forms of capital control" does not inexorably lead to the conclusion, as Hopkins suggests, that nonprofit hospitals are not within the Act's coverage. Such a narrow reading of this phrase of the declaration of policy ignores the clear import of the rest of § 63 along with one of the essential precepts underlying the Act's passage, namely, that "the individual unorganized worker is helpless to exercise actual liberty of contract, and . . . to obtain acceptable terms and conditions of employment." In this respect, employees of a nonprofit hospital, regardless of the hospital's beneficent function, are not different from employees in other fields. We see nothing in the Act mandating an exemption for nonprofit hospitals, giving due regard to the vital services which hospitals perform. The containment of violence and undue disruption at the site of a labor dispute involving a hospital is a police function. And, while even the smallest disruption of normal hospital operations is a matter of concern, the police are available to contain the activities of striking workers to insure an acceptable level of hospital services.

It is undisputed that there is no express exemption for nonprofit hospitals in the Maryland Act. While it is true that statutes in derogation of the common law, and especially those depriving a court of jurisdiction should be strictly

construed, it is a cardinal rule that in construing a legislative enactment courts should confine themselves to a construction of a statute as written, and not attempt, under the guise of statutory construction, to supply omissions or remedy possible defects in the statute, or to insert exceptions not made by the legislature. Cases to this effect are legion. *Employ. Sec. Adm. v. Browning-Ferris,* 292 Md. 515, 438 A.2d 1356 (1982); *Baltimore Gas & Elec. v. Department,* 284 Md. 216, 231, 395 A.2d 1174 (1979) (construing a statute liberally and adding to it, by judicial fiat, a provision which the legislature did not see fit to include are not one and the same thing); *Amalgamated Ins. v. Helms,* 239 Md. 529, 535-36, 212 A.2d 311 (1965).

In the forty-seven years since the Act's adoption, the legislature has never exempted nonprofit hospitals from its coverage.[10] Therefore, we hold that nonprofit hospitals are within the coverage of the Maryland Act.

> *Judgment of the Court of Special Appeals vacated; case remanded to that Court with directions that it remand the case to the Circuit Court No. 2 of Baltimore City with directions to vacate the decree of that Court.*
> *Costs to be paid by appellee.*

---

10. In Nat'l Union of Hosp. v. Lafayette Square, 34 Md. App. 619, 368 A.2d 1099 (1977), the Court of Special Appeals applied the Act without question to striking employees of a private nursing home and therefore did not reach the question we resolve today.