952 A.2d 379

**Dang H. VU, et al.**

v.

**ALLIED FOOT & ANKLE, P.C.**

**No. 1427, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

July 2, 2008.

---

James P. Gillece, Jr. (David M. Stevens, Whiteford, Taylor & Preston, LLP on the brief), Baltimore, for appellant.

Gregory A. Dorsey of Westminster, for appellee.

Argued before DEBORAH S. EYLER, BARBERA and ROBERT B. KERSHAW (Specially Assigned), JJ.

**DEBORAH S. EYLER, J.**

> Must we sew and sew solely to survive So some low so-
> and-so can thrive!   No! He'll fry in Hades if it's up
> to the ladies, Waistmaker's Union Local 25!

So sings the chorus of lady picketers in *Fiorello!*, the Broadway musical about the life of Fiorello H. LaGuardia.[1] The diminutive politician began his legal career in the early 20th Century as a pro-labor activist, fighting sweatshop owners. Before becoming mayor of New York City, he served several terms in Congress. In 1933, he co-sponsored the Norris–LaGuardia Act, 29 U.S.C. §§ 101 to 115, which "place[d] restrictions on the power of [federal] equity courts to grant injunctions in labor disputes." *Dist. 1199E, Nat'l Union of Hosp. & Health Care Employees, Div. of R. W.D.S. U., AFL–CIO v. The Johns Hopkins Hosp.*, 293 Md. 343, 345, 444 A.2d 448 (1982). " 'This purpose reflect[ed] the feeling in this

---

1. "Unfair," from FIORELLO! ORIGINAL CAST ALBUM (Capitol Records 1959), music by Jerry Bock and lyrics by Sheldon Harnick.

country during the 1930's that courts of equity were unduly hampering the labor movement by enjoining necessary and proper union activities, especially by means of *ex parte* injunctions.'" *Id.* (quoting Leonard F. Cohen, *The Maryland Law of Strikes, Boycotts, and Picketing,* 20 Md. L.Rev. 230, 239 (1960)).

Many state legislatures followed suit, enacting "Little Norris–LaGuardia Acts," patterned on the federal legislation. Maryland's Act, also known as the "Maryland Anti–Injunction Act" ("Maryland Act" or "Act"), became law in 1935, and now is codified at Md.Code (1991, 1999 Repl.Vol., 2007 Supp.) sections 4–301 *et seq.* of the Labor and Employment Article ("LE").

In the case at bar, Dang H. Vu, D.P.M., contends that his contract dispute with Allied Foot & Ankle, P.A. ("Allied Foot"), his former employer, is governed by the Maryland Act; and, under the Act, he is entitled to recover damages against a bond Allied Foot posted when it sought and obtained a Temporary Restraining Order ("TRO") against him. As we shall explain, we disagree that the Act applies to the parties' dispute. We therefore shall affirm the order of the Circuit Court for Carroll County denying Dr. Vu's motion for damages against the bond.

## FACTS AND PROCEEDINGS

Dr. Vu, the appellant, is a podiatrist. In 2002, he was hired as an at-will employee of Drs. Stroh and Butler, P.A. ("S & B, P.A."). On April 17, 2003, he and S & B, P.A. entered into an employment agreement ("Agreement") that contained a five-year non-competition clause. The following year, on January 1, 2004, Drs. Stroh and Butler divided their practice. Dr. Butler formed Allied Foot, the appellee. Under the terms of the division of the practice, Dr. Vu became an employee of Allied Foot, and S & B, P.A., purported to assign the Agreement to it.

On June 8, 2006, after purchasing another podiatry practice, Dr. Vu formed Family Podiatry, LLC ("Family Podiatry").

On June 30, 2006, he submitted a termination letter to Allied Foot, stating that he was resigning from employment effective July 30, 2006. In August 2006, Dr. Vu began practicing as Family Podiatry. In short order, on August 23, 2006, Allied Foot sued Dr. Vu, alleging that he was violating the non-competition clause in the Agreement. The complaint stated claims for breach of contract and in tort and requested injunctive relief, including a TRO.

The next day, August 24, 2006, Allied Foot's counsel notified counsel for Dr. Vu and both appeared in chambers before the judge assigned to the matter (who remained assigned to the case). After hearing from counsel, the court granted the TRO, upon Allied Foot's posting a $50,000 bond. The TRO prohibited Dr. Vu from practicing podiatry within a 20-mile radius of Allied Foot's offices. That area included several of Family Podiatry's offices and Carroll County Hospital Center, where Dr. Vu performed procedures. The bond as originally posted was for $25,000. It was increased to $50,000 at the judge's direction. The bond is entitled, "PLAINTIFF'S IN-JUNCTION BOND TO DEFENDANT—Temporary Restraining Order."

On August 29, 2006, Dr. Vu filed a motion to dismiss the complaint for failure to state a claim for which relief may be granted. He argued that, under the terms of the Agreement, Pennsylvania contract law applied and, under that law, the non-competition clause was unenforceable. He did not present any argument specific to Allied's request for injunctive relief.[2]

The motion to dismiss was heard by the court the same day it was filed. The court ruled in part to deny the motion and continued the hearing to the following day, August 30, 2006.

---

**2.** Dr. Vu did not contend below, and does not argue on appeal, that the Maryland Act does not apply or that Pennsylvania's Little Norris–LaGuardia Act, 43 Pa. Stat. Ann. § 206a, *et seq.* (West 2008), does apply. No argument has been made by either party about the application *vel non* of Pennsylvania law, and neither party gave notice, pursuant to section 10–504 of the Courts and Judicial Proceedings Article ("CJ"), that Pennsylvania law applies.

At the conclusion of that hearing, the court denied the motion to dismiss in its entirety. Immediately thereafter, it held an evidentiary hearing on Allied Foot's preliminary injunction request. Allied Foot called four witnesses. Dr. Vu testified on his own behalf and called one witness. In closing argument, with respect to the request for injunctive relief, neither counsel made any mention of the Maryland Act.

The court denied the motion for preliminary injunction on the primary ground that Allied Foot had not presented sufficient evidence to show that it was likely to prevail on the merits of its breach of contract and other claims. The court dissolved the TRO and ruled that the case would continue on a regular track.

On November 16, 2006, Dr. Vu filed a motion for summary judgment, which Allied Foot opposed. On March 1, 2007, not long before the scheduled hearing on the summary judgment motion, Dr. Vu filed a "Motion to Assess Damages Under Bond Number 30BSBED364" ("Bond Motion"). For the first time, he argued that the Maryland Act was controlling and entitled him to compensation against the bond for approximately $15,000 in lost income from the practice of podiatry during the seven days the TRO was in effect, and for attorney's fees incurred in contesting the injunction.

The motion for summary judgment hearing was held on March 16, 2007, before the deadline for Allied Foot to respond to the Bond Motion. During the hearing, the court made reference to the Bond Motion, stating that it would be taken under consideration. The court held the motion for summary judgment *sub curia*. Thereafter, Allied Foot filed an opposition to the Bond Motion, and Dr. Vu filed a reply. Allied Foot argued, among other things, that the Maryland Act had had no application to its injunction request.

On July 19, 2007, the court issued a memorandum opinion and order granting summary judgment in favor of Dr. Vu, on the merits of the breach of contract and other claims. The memorandum opinion did not mention the Bond Motion. Two

weeks later, on July 31, 2007, the court issued a brief order, entered on August 2, denying that motion.

Allied Foot noted an appeal from the grant of summary judgment and Dr. Vu noted a cross-appeal from the denial of the Bond Motion. Allied Foot voluntarily dismissed its appeal in this Court. Dr. Vu's cross-appeal remains. He poses two questions for review, which we have rephrased:

I. Did the circuit court lack discretion to deny the Bond Motion, and therefore err in denying it?

II. If the circuit court had discretion to deny the Bond Motion, did it abuse its discretion in doing so?

For the reasons we shall explain, we hold that the circuit court had discretion to deny the Bond Motion, and did not abuse its discretion in doing so.

## DISCUSSION

### I.

### (A)

We begin with a review of the Maryland Act. Part I consists of definitions and general provisions, about which we shall have more to say. Part II, consisting only of LE section 4–307, completely eliminates a circuit court's jurisdiction to grant certain prohibitory injunctive relief.[3] Part II is not implicated in this case.

------

**3.** LE section 4–307 states:

A court does not have jurisdiction to grant injunctive relief that specifically or generally:
(1) prohibits a person from ceasing or refusing to perform work or to remain in a relation of employment, regardless of a promise to do the work or to remain in the relation;
(2) prohibits a person from becoming or remaining a member of an employer organization or labor organization, regardless of a promise described in § 4–304 of this subtitle;
(3) prohibits a person from paying or giving to, or withholding from, another person any thing of value, including money or strike or unemployment benefits or insurance;

Part III, comprised of LE sections 4–310 through 4–320, limits a circuit court's power to grant injunctive relief in a "labor dispute," in circumstances not already covered by Part II. Specifically, in a labor dispute, except as a stop-gap measure to prevent imminent irreparable harm, the court may not grant injunctive relief unless the plaintiff has complied with certain legal obligations and has made particular efforts to resolve the dispute. LE § 4–313. Further, the court "may not issue a temporary or permanent injunction in a case that involves or grows out of a labor dispute" unless notice, as specified, has been given, and a hearing is held. LE § 4–314. The hearing must be "in open court" with testimony taken and the opportunity for cross-examination. LE § 4–314(2). In addition, the court must make particular factual findings, including that an "unlawful act" has been threatened or committed and, unless restrained, will be committed or continued; the plaintiff will be injured "substantially and irreparably" if

---

(4) prohibits a person from helping, by lawful means, another person to bring or defend against an action in a court of any state or the United States;

(5) prohibits a person from publicizing or obtaining or communicating information about the existence of or a fact involved in a labor dispute by any method that does not involve the act or threat of a 'breach of the peace, fraud, or violence, including:

(i) advertising;

(ii) speaking; and

(iii) patrolling, with intimidation or coercion, a public street or other place where a person lawfully may be;

(6) prohibits a person from ceasing:

(i) to patronize another person; or

(ii) to employ another person;

(7) prohibits a person from assembling peaceably to do or to organize an act listed in items (1) through (6) of this section;

(8) prohibits a person from advising or giving another person notice of an intent to do an act listed in items (1) through (7) of this section;

(9) prohibits a person from agreeing with another person to do or not to do an act listed in items (1) through (8) of this section;

(10) prohibits a person from advising, inducing, or urging another person, without the act or threat of fraud or violence, to do an act listed in items (1) through (9) of this section, regardless of a promise described in § 4–304 of this subtitle; or

(11) on the ground that the persons are engaged in an unlawful conspiracy, prohibits a person from doing an act listed in items (1) through (10) of this section in concert with another person.

relief is not granted; the balance of hardship weighs in favor of the plaintiff; the plaintiff has no adequate remedy at law; and public authorities have failed to or cannot protect the plaintiff's property. LE § 4–314.[4]

LE section 4–316, entitled "Bonds," requires that a bond be posted before a court may grant certain injunctive relief. It states, in relevant part:

(a) *Required for temporary restraining order or temporary injunction.*—Before a court issues a temporary restraining order or temporary injunction **in a case that involves or grows out of a labor dispute,** the plaintiff shall post bond with the court.

(b) *Amount.*—(1) Bond under this section shall be in an amount sufficient to compensate each person who is enjoined for any loss, expense, or damages that *improvident or erroneous issuance* of the temporary restraining order or temporary injunction causes.

(2) The amount shall include reasonable counsel fees and other reasonable costs that a defendant incurs in defending against other injunctive relief in the same case if the court denies the injunctive relief.

(Emphasis added.)

Dr. Vu asserts that Allied Foot's suit against him "involve[d] or gr[ew] out of a labor dispute," so the court's decision to issue a TRO was (or at least should have been) governed by

---

**4.** The Act further provides at Part III, LE section 4–315, that a "temporary restraining order" may be issued *before* a hearing is held if the plaintiff has met the requirements of LE section 4–314 and further has shown that without relief substantial and irreparable injury to the property in question is "unavoidable." LE § 4–315(a). In that situation, the court must issue an order giving any party sought to be restrained a "reasonable period of at least 48 hours" to show cause why the TRO should not be granted. LE § 4–315(b). A TRO issued under LE section 4–315 "is effective for the period the court sets but not more than 5 days." LE § 4–315(c)(1). The TRO becomes void at the expiration of that period, unless proper procedures are taken and findings made to extend or renew it. *Id.* at subsection (c)(3).

In the case at bar, a hearing was held before the TRO was issued. Therefore, if the Act applies at all, LE section 4–315 would not apply.

the Maryland Act. As he reads LE section 4–316(b), if the TRO was "improvident[ly] or erroneous[ly] granted," he is entitled to recover against the bond losses he sustained as a consequence of his being enjoined from practicing podiatry at certain locations from August 24 through August 30, 2006. He maintains that, so long as the TRO was granted improvidently or erroneously, which he claims it was, the court was without discretion to deny his Bond Motion.

In Part III of the Act, a "[l]abor dispute case" is defined as follows:

A case shall be held to involve or grow out of a labor dispute when the case involves:

(1) *persons who are engaged in a single* industry, trade, craft, or *occupation,* employees of the same employer, or members of the same or an affiliated organization of employees or employers, *regardless of whether the dispute is between:*

(i) *1 or more employees or associations of employees and 1 or more employers or associations of employers;*

(ii) 1 or more employees or associations of employees and 1 or more employees or associations of employees;

(iii) 1 or more employers or associations of employers and 1 or more employers or associations of employers; or

(2) a conflicting or competing interest in a labor dispute of a person participating or interested in the labor dispute.

LE § 4–310 (emphases added). "Labor dispute" is earlier defined in Part I of the Act to

*include[ ] any controversy, regardless of whether the disputants stand in the proximate relation of employee or employer,* concerning:

(1) terms of conditions of employment;

(2) employment relations;

(3) the association or representative of persons in negotiating, setting, maintaining, or changing terms or conditions of employment; or

(4) *any other controversy arising out of the respective interests of employee or employer.*

LE § 4–301(c) (emphases added).

Dr. Vu maintains that the dispute over whether he breached the non-competition clause of the Agreement was a "labor dispute," under LE section 4–301(c)(4), because it was a controversy "arising out of the respective interests of the employee or employer"; and that Allied Foot's suit against him was a "labor dispute case" because, notwithstanding that it was between only one (former) employee and one (former) employer, it involved people in the same occupation (podiatry). LE § 4–310(1)(i).

Allied Foot responds that the dispute over whether Dr.Vu violated the non-competition clause of the Agreement was not a "labor dispute" under LE section 4–301(c)(4), and its suit against Dr. Vu was not a "labor dispute case" under LE section 4–310(1)(i). It points out that LE section 4–303 directs that the Act be "interpreted and applied in accordance with the policy stated in § 4–302 of this subtitle"; and that policy and the legislative findings supporting it read as follows:

(a) *Findings.*—The General Assembly finds that:

(1) governmental authority has allowed and encouraged employers to organize in corporate and other forms of capital control; and

(2) in dealing with these employers, an individual worker who is not represented by an organization is helpless to exercise liberty of contract or to protect personal freedom of labor and, thus, to obtain acceptable terms and conditions of employment.

(b) *Statement of policy.*—The policy of the State is that:

(1) negotiation of terms and conditions of employment should result from voluntary agreement between employees and employer; and

(2) therefore, each individual worker must be:

(i) fully free to associate, organize, and designate a representative, as the worker chooses, for negotiation of terms and conditions of employment; and

(ii) free from coercion, interference, or restraint by an employer or an agent of an employer in:

1. designation of a representative;

2. self-organization; and

3. other concerted activity for the purpose of collective bargaining or other mutual aid or protection.

LE § 4–302.

Citing LE section 4–302, Allied Foot argues: "It is beyond logic to suggest the underlying dispute in this case fits squarely into the stated public policy of the Act; which undoubtedly encourages organized labor, and frowns upon injunctions that restrict such activity." It maintains that the Act does not apply, and therefore LE section 4–316, pertaining to "Bonds," does not apply. Rather, in this case, the TRO was issued pursuant to the circuit court's general equity power and in conformity with Rule 15–501 *et seq.*, which cover injunctions.

Rule 15–504(a) provides that a TRO may be granted "... only if it clearly appears from specific facts shown by affidavit or other statement under oath that immediate, substantial, and irreparable harm will result to the person seeking the order before a full adversary hearing can be held on the propriety of a preliminary or final injunction." Before the TRO is granted, a bond must have been filed, "in an amount approved by the court for the payment of any damages to which a party enjoined may be entitled as a result of the injunction." Rule 15–503(a). Allied Foot posits that this language makes the decision by a court to grant relief against a bond issued on a TRO discretionary, not mandatory.

### (B)

We conclude that Dr. Vu's contention that the dispute in question was a "labor dispute," and that Allied Foot's case against him was a "labor dispute case," within the meaning of

the Act, was not properly preserved below and, in any event, is substantively without merit.

We have searched the record and have found nothing to show or even suggest that the TRO was issued pursuant to the Act, as opposed to pursuant to the court's general equity power and Rule 15–514. No record was made of the August 24, 2006 in-chambers TRO hearing. That fact alone militates against the TRO's having been issued under the Act, as the Act requires, as we have explained, that before a temporary injunction is issued, a hearing be held in open court. LE § 4–314(2).

If in opposing the TRO Dr. Vu was of the position that the court's decision was controlled by the Act, it was incumbent upon him to raise that point immediately so as to afford the court the opportunity to conduct a hearing that would satisfy the requirements of the Act. Dr. Vu does not argue that he informed the court that its decision was governed by the Act but the court did not take measures in conformity. Rather, we only can glean from the record that Dr. Vu willingly participated, without objection, in proceedings on August 24, 2006, that were not in conformity with the Act. In other words, he proceeded as if the Act did not apply, but later asserted—and no w argues—that it did.

The TRO and the bond themselves make no mention of the Act. Dr. Vu did not file any written opposition to the issuance of the TRO based on the Act. Indeed, his only filing between the time suit was filed and the court's ruling on August 30, 2006, dissolving the TRO, was a motion to dismiss, asserting only that the non-compete covenant was unenforceable under Pennsylvania law, but not addressing the propriety of the TRO issuance. The transcript of the August 30 hearing reveals that Dr. Vu (through counsel) did not argue that the injunction was issued contrary to the Act, or that the court should dissolve it because it was granted in violation of the Act. Indeed, the argument Dr. Vu advanced that the injunction should be dissolved w as predicated upon the Maryland common law of injunctions, not upon statutory law.

As noted above, the right to proceed for damages against a bond posted pursuant to LE section 4–316 depends upon whether the TRO or temporary injunction was issued "improvident[ly] or erroneous[ly]." LE § 4–316(b)(1). Given that the Act eliminates the circuit court's power to grant certain prohibitory injunctive relief, circumscribes its power to grant other injunctive relief, in a labor dispute case, and specifies not only the procedure that must be followed but also the substantive findings that must be made for the court to issue an injunction in a labor dispute case, logic dictates that, if the Act applies at all, the question whether a temporary injunction was issued "improvident[ly]" or "erroneous[ly]" depends, in the first instance, upon whether it was issued in conformity with the Act.

In his argument to this Court, Dr. Vu overlooks that logical connection and assumes that an injunction may be found to have been issued "improvidently" or "erroneously" irrespective of the requirements of Act. We disagree with that assumption. The "Bond" enforcement rule in LE section 4–316 is part of a statutory scheme and must be considered in its context, which is to limit injunction as a remedy in labor dispute cases. *See Stachowski v. Sysco Food Services of Baltimore, Inc.*, 402 Md. 506, 516, 937 A.2d 195 (2007) (statutory language must be interpreted in light of "statutory scheme as a whole"). In that context, an enhanced right to proceed against a bond, when, despite the restrictions imposed by the Act, an injunction wrongly has been issued and damages have resulted, is a fail safe provision.

Accordingly, *if* the Act applied to this case, as Dr. Vu maintains it does, he only would be entitled to damages against the bond if the temporary injunction were issued improvidently or erroneously *under the Act.* In order to challenge the issuance of the temporary injunction under the Act, however, Dr. Vu had to have opposed its issuance under the Act when the injunction was sought. If a party opposing an injunction ever is to assert, later, that the injunction was issued improvidently or erroneously under the Act, he must have raised the Act as a defense to the issuance of the

injunction; otherwise, the issue is waived, as the court will have had no reason to consider the requirements of the Act in deciding whether to issue the injunction. *See Umeko, Inc. v. New York Coat, Suit, Dress, Rainwear & Allied Workers Union,* 484 F.Supp. 210, 211 (S.D.N.Y.1980) (failure to raise issue of the Norris–LaGuardia Act in opposition to request for TRO waives any later claim to attorneys' fees because of "improvident or erroneous issuance" of TRO); *see also Int'l Ladies' Garment Workers' Union v. Donnelly Garment Co.,* 147 F.2d 246, 253 (8th Cir.) (party who did not raise adequacy of bond at initial hearing waived issue on appeal), *cert. denied,* 325 U.S. 852, 65 S.Ct. 1088, 89 L.Ed. 1972 (1945).

Here, by not challenging the temporary injunction, when it was sought, as being in violation of the Act, Dr. Vu waived his right to pursue damages against the bond under the Act.

### (C)

Even if the issue were not waived, we would find it without merit, because the dispute in this case is not a "labor dispute" in a "labor dispute case," within the meaning of those terms in the Act. We note from the outset that neither party has cited any cases under the Maryland Act, similar Little Norris–LaGuardia Act state statutes, or the Federal Act that have addressed whether a dispute between a former employee and former employer about a violation *vel non* of a non-competition clause of an employment contract is a "labor dispute." Our independent research has disclosed but two cases touching on the subject, both from the 1940's.

In *Cascade Laundry, Inc. v. Volk,* 129 N.J.Eq. 603, 20 A.2d 505 (1941), a laundry business sought to enjoin several of its employees from working for a competing business, in violation of covenants not to compete the employees had signed when they were hired. In fact, the employees were not working for the laundry business because, on March 24, 1941, they had declared a strike when negotiations over their terms of employment failed. Nine days earlier, the New Jersey legisla-

ture had enacted that state's Little Norris–LaGuardia Act. 1941 N.J. Laws ch. 15, then codified at N.J.S.A. 2:29–77.1 *et seq.*[5] As then written, the New Jersey Act prohibited any judge from issuing a temporary or permanent injunction "in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a bill of complaint made under oath, and testimony in opposition thereto, if offered," and upon making certain specific factual findings. N.J.S.A. 2:29–77.3. The New Jersey Act defined "labor dispute" in substantively the same terms as present LE section 4–319, including "any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand[ ] in the proximate relations of employer and employee." N.J.S.A. 2:29–77.8.

The *nisi prius* New Jersey equity court ruled that the employer's injunction request was governed by that state's Little Norris–LaGuardia Act, where the dispute arose out of a strike:

> There surely can be no doubt that the present controversy between [the employer and employees] has arisen out of their interests as employer and employee. The covenant [not to compete] was conceived to protect the interest of the employer; the employee, as a prerequisite to employment, signed it. The strike involves the respective interests of employer and employee; [the employer] charges that its customers are being taken from it by those who, as employees, were trusted to keep them for it while [the employees] claim they are servicing these customers during the strike to earn a living, but, also, to hold them for [the employer] until such time as the strike shall have been terminated. If the relationship of employer and employee had not been created there would have been no necessity for a covenant

---

5.  Currently codified at N.J.S.A. 2A:15–51, *et seq.* (2000).

and if there had been no strike the present alleged breach of the covenant would not be before this court.

129 N.J.Eq. at 607–08, 20 A.2d 505.

By contrast, in *Saltman v. Smith,* 313 Mass. 135, 46 N.E.2d 550 (1943), the Supreme Judicial Court of Massachusetts held that an injunction suit by an employer against former employees for violating covenants not to compete in their employment contracts did *not* involve or grow out of a "labor dispute," so as to be controlled by the Massachusetts Little Norris–LaGuardia Act. There, the employer, a music teacher, expanded the school he ran and hired two teachers to assist him. The teachers signed employment contracts that provided that they would be paid a percentage commission of the fees received for the pupils they taught. Each contract included a covenant not to compete. After about two years, when business started dropping off, the employees became unhappy with their earnings and entered into discussions with the employer for payment on a straight salary basis. When they were not able to reach an agreement, the employees offered to quit, and the employer accepted their offers. The employer then brought a suit in equity, seeking to enjoin the employees from violating the covenants not to compete in their employment contracts. The court issued the injunction.

On appeal, the employees argued that the injunction request was governed by the Massachusetts Little Norris–LaGuardia Act, enacted in 1935 and then codified at MASS. GEN. LAWS ch. 214, § 9A (1935),[6] because it was a controversy growing out of a labor dispute; and that the trial court had been without authority to issue the injunction without adhering to that Act. At that time, the Massachusetts Act defined a "labor dispute" as a dispute concerning the terms and conditions of employment or the association or representation of people in negotiating terms or conditions of employment. MASS. GEN. LAWS ch. 149, § 20C (1935).[7] The court rejected the employees' argu-

---

6. Currently codified at MASS. GEN. LAWS ANN. ch. 214, § 6 (West 2008).

7. Currently codified at MASS. GEN. LAWS ANN. ch. 149, § 20C(c) (West 2008).

ment, holding that the dispute was not a "labor dispute," within the meaning of the Massachusetts Act:

> The bill is merely one for specific performance of covenants restraining trade or competition, inserted in contracts for personal service, covenants of a character that have long been held enforceable in this Commonwealth .... where the contract for personal service is not itself invalid, the interest to be protected is consonant with public policy, and the restraint is limited reasonably in time and space. The judge had authority to issue an injunction....

313 Mass. at 143, 46 N.E.2d 550 (citations omitted). *Cf. Mengel v. Justices of Superior Court,* 313 Mass. 238, 246–47, 47 N.E.2d 3 (1943) (holding that a controversy that *is* a labor dispute, within the meaning of the Massachusetts Act, is not taken outside the scope of that act merely because it also involves breaches of an employment contract).

The holdings in *Cascade Laundry* and *Saltman* undercut Dr. Vu's argument that the injunction request in this case was covered by the Maryland Act. Although the New Jersey Act, like the Maryland Act, broadly defined a "labor dispute" to include any controversy arising out of the respective interests of employer and employee, regardless of the remaining existence *vel non* of the employer/employee relationship, the New Jersey court's opinion makes clear that the reason the case was found to have arisen out of a labor dispute was that it was the outgrowth of an employee strike, which without question is a "labor dispute." Indeed, it was the strike that the court determined involved "the respective interests of employer and employee," and thus was a labor dispute. There is nothing in the opinion that would suggest that, absent the employee strike, a controversy over whether the employees were violating the non-competition clauses in their contracts would be a "labor dispute," within the meaning of the New Jersey Act.

Conversely, although the definition of "labor dispute" in the Massachusetts Act (as it then was worded) is not as broad as the definition in LE section 4–301(c), in that it does not include the general "any other controversy between em-

ployer and employee" language, the *Saltman* court made plain in its holding that technical satisfaction of the language of an anti-injunction act will not suffice to make a controversy a labor dispute when the context for the dispute is an alleged breach of a personal services employment contract between an employee and former employer. One of the stated objectives of the Federal Act, the Maryland Act, and other Little Norris–LaGuardia Acts is to enhance and thereby equalize the bargaining positions of workers, so that terms and conditions of employment will be subject to fair negotiation and controlled by contracts freely entered into by all parties. A personal service employment contract such as the Agreement in this case is a type of freely-bargained contract that was not subject to abuse prior to the labor movements of the early 20th Century. The restraints on the injunctive power of the courts imposed by the Federal Act and the various state anti-injunction acts were not designed to remedy contract disputes over negotiated non-competition clauses. Indeed, in the absence of any evidence of adhesion, a personal service employment contract such as the Agreement is a freely-bargained contract of the sort the anti-injunction acts were meant to promote.

█ The Maryland Act expressly directs courts to interpret the Act with reference to the guiding policies set forth in LE section 4–302. LE § 4–303. Like the Federal Act and other Little Norris–LaGuardia Acts enacted in the 1930's and 1940's, the Maryland Act makes plain that, notwithstanding any technical reading of statutory language to the contrary, the Act is meant to limit the remedy of injunction for disputes arising in the context of organized or union labor, not for private contract disputes. The General Assembly's factual findings, as spelled out in LE section 4–302(a), are that governmental support for workers to organize aids individual workers because, through organized labor unions, they achieve parity with their employers in negotiating terms and conditions of employment. The policy findings, in LE section 4–302(b), are two-fold: that terms and conditions of employment between workers and employers should "result from voluntary agree-

ment"; and that, for that to happen, workers must have the freedom to organize.

Historically, employers had sought and obtained the remedy of injunction to thwart workers in organized labor activities, most notably strikes and picketing, that gave them leverage and bargaining power. The anti-injunction statutes of the 1930's and 1940's, including the Maryland Act, were designed to limit and, in some circumstances, circumscribe entirely the remedy of injunction as it was being used by employers to suppress labor organization. *See, e.g., Bhd. of R.R. Trainmen, Enterprise Lodge, No. 27 v. Toledo, Peoria & Western R.R.*, 321 U.S. 50, 56, 64 S.Ct. 413, 88 L.Ed. 534 (1944) (district court erred in granting railroad injunctive relief because railroad did not make "every reasonable effort" to settle dispute with union as required by Norris–LaGuardia Act); *Taylor v. Southwestern Bell Tel. Co.*, 251 F.3d 735, 742–43 (8th Cir.2001) (district court failed to give effect to the "strong federal policy of encouraging arbitration [in labor disputes] by making an injunction a last line of defense" as embodied in Norris–LaGuardia Act in granting injunctive relief); *Dist. 1199E, supra*, 293 Md. at 360, 444 A.2d 448 (employer's strict compliance with terms of Maryland's Little Norris–LaGuardia Act necessary for court to order injunction).

The broad interpretation of the Maryland Act, in particular LE sections 4–301 and 4–310, that Dr. Vu advocates would take the Act out of its historical and policy context, and have it apply to virtually any workplace and former workplace dispute. Citing LE section 4–301, he maintains that the dispute here is a "labor dispute" because it is a "controversy arising out of the respective interests of employee or employer," notwithstanding (as the statute permits) that he and Allied Foot are no longer employee and employer. Thus, the mere fact that the dispute stems from the "respective interests of employee or employer" is sufficient to make it a "labor dispute." Citing LE section 4–310, Dr. Vu maintains that this case is a "labor dispute case" because he and Allied Foot are engaged in "a single ... occupation"—podiatry—notwithstanding (as the statute permits) that the dispute is between

but one "employee" and one "employer." The fallacy in these assertions is that they recognize no difference between the concepts of "labor" and "employment," and, more important, they are unrelated to the purposes of the Act and, if anything, run at cross-purposes to the Act. Furthermore, because the Maryland Act is in derogation of the law and deprives a court of jurisdiction, it must be strictly construed. *District 1199E, supra,* 293 Md. at 359–60, 444 A.2d 448.

For all of these reasons, we hold that the decision whether to grant the injunction Allied Foot sought against Dr. Vu was not governed by the Maryland Act. Therefore, none of the provisions of the Act, including LE section 4–316, had a bearing on the court's injunction ruling. Likewise, the question before the trial court on the Bond Motion—whether Dr. Vu could, should, or must recover against the bond monies allegedly lost as a result of the TRO's issuance—was to be answered not in light of any entitlement that might be conferred by LE section 4–316 but rather in light of general Maryland common law and Rule 15–503 for injunctions. Accordingly, the answer to Dr. Vu's first question, whether the trial court should have ruled that, under the Maryland Act, Dr. Vu could recover against the bond as a matter of right, is "no."

## II.

Dr. Vu's second contention also lacks merit. He argues that the trial court abused its discretion when it denied his Bond Motion because it did not exercise any discretion in doing so, and the failure to exercise discretion in that circumstance is itself error. *See Maus v. State,* 311 Md. 85, 108, 532 A.2d 1066 (1987) ("When a court must exercise its discretion, failure to do so is error, and ordinarily requires reversal."). In particular, Dr. Vu argues that the trial judge did not exercise discretion in denying his Bond Motion because no hearing was held, no "opinion" setting forth the basis for his decision was issued, and the record otherwise does not reflect that he used discretion in deciding to deny the Bond Motion.

Neither Dr. Vu nor Allied Foot requested a hearing on the Bond Motion. The Maryland injunction rules do not require that a hearing be held on any request to recover against a bond posted upon the issuance of an injunction. A hearing was held on the summary judgment motion, but, because the Bond Motion was filed 15 days before that hearing, Allied Foot had not had an opportunity by then to respond to the motion. At the summary judgment hearing, counsel for Dr. Vu did not ask that the Bond Motion be set in for a hearing.

In advancing the Bond Motion, Dr. Vu submitted a memorandum of law setting forth his legal arguments. In opposing the Bond Motion, Allied Foot did the same. When the court ruled on the Bond Motion, it already had decided the underlying case on summary judgment, and so was well versed about the allegations of fact, including those on which it (by the same judge) had granted the TRO. The court had before it the legal arguments and facts particular to the Bond Motion as presented by affidavit. In its order denying the Bond Motion, the court stated that its ruling was made "[u]pon due consideration" of the motion and the response. Contrary to Dr. Vu's contention, there is nothing in this record to suggest that the court did not exercise discretion when it ruled to deny the Bond Motion. Thus, the answer to Dr. Vu's second appeal question, whether the court abused its discretion by denying the Bond Motion, is "no."

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**